**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No. 08-cv-02209-REB-MJW

TROY A. SHORT,

    Plaintiff,

v.

CAPTAIN A. J. TRUJILLO,
LIEUTENANT CORY BURKET, and
LIEUTENANT JAMES MAESTAS,

    Defendants.

## ORDER RE: MOTION FOR SUMMARY JUDGMENT

**Blackburn, J.**

The matter before me is defendants' **Motion for Summary Judgment** [#137][1]

filed June 24, 2011. With the consent of the magistrate judge, the **Order of**

**Reference** [#138] filed June 27, 2011, is withdrawn. I grant the motion.[2]

### I. JURISDICTION

I have jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal

question).

---

[1] "[#137]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

[2] The issues raised by and inherent to the motion for summary judgment are fully briefed, obviating the necessity for evidentiary hearing or oral argument. Thus, the motion stands submitted on the papers. *Cf.* **FED. R. CIV. P. 56(c)** and **(d)**. *Geear v. Boulder Cmty. Hosp.,* 844 F.2d 764, 766 (10th Cir.1988) (holding that hearing requirement for summary judgment motions is satisfied by court's review of documents submitted by parties).

## II. STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. **FED.R.CIV.P.** 56(c); **Celotex Corp. v. Catrett**, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A dispute is "genuine" if the issue could be resolved in favor of either party. **Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.**, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); **Farthing v. City of Shawnee**, 39 F.3d 1131, 1135 (10th Cir. 1994). A fact is "material" if it might reasonably affect the outcome of the case. **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); **Farthing**, 39 F.3d at 1134.

A party who does not have the burden of proof at trial must show the absence of a genuine fact issue. **Concrete Works, Inc. v. City & County of Denver**, 36 F.3d 1513, 1517 (10th Cir. 1994), **cert. denied**, 115 S.Ct. 1315 (1995). Once the motion has been properly supported, the burden shifts to the nonmovant to show, by tendering depositions, affidavits, and other competent evidence, that summary judgment is not proper. **Id.** at 1518. All the evidence must be viewed in the light most favorable to the party opposing the motion. **Simms v. Oklahoma ex rel. Department of Mental Health and Substance Abuse Services**, 165 F.3d 1321, 1326 (10th Cir.), **cert. denied**, 120 S.Ct. 53 (1999).

## III. ANALYSIS

Plaintiff, a prisoner in the Colorado Department of Corrections ("CDOC"), at all times relevant to this lawsuit was incarcerated at the Fort Lyon Correctional Facility

("FLCF") in Fort Lyon, Colorado. While incarcerated in Ohio in the late 1990s, plaintiff provided information to law enforcement about the murder of a prison guard that led to the conviction of members of an Aryan prison gang. In December, 2005, while incarcerated at the Fremont County, Colorado, jail, plaintiff provided information that helped officials thwart a planned escape and murder plot by white supremacist inmates. As a result of his assistance in these matters, plaintiff was labeled a "snitch" by other inmates.

At the time plaintiff was transferred to FLCF in December, 2006, his "blue card" showed that he had been labeled a snitch by no less than five other individually identified inmates. Because none of the people with whom plaintiff previously had custody issues was at FLCF, however, he was placed in the general population in Cell House 4. Plaintiff contends that despite multiple requests to be transferred to protective custody or to Cell House 5, which allegedly houses proportionately fewer white supremacist gang members, he remained in Cell House 4 throughout his incarceration at FLCF.

On April 11, 2007, plaintiff was assaulted in his room by two other inmates, Eric Sounders and Dale Davis, both members of white supremacist prison gangs. Plaintiff alleges that he told his case manager, defendant James Maestas, about the assault the following day.[3] Although plaintiff did not file a formal grievance, in July, 2007, he sent a letter to the Associate Warden complaining of the April assault. Therein, plaintiff also revealed that he had been placed in protective custody in Ohio due to his past

---

[3] According to plaintiff, Maestas questioned whether plaintiff "want[ed] to make an issue of this," telling him "[y]ou already have enough security issues, you don't need any more."

testimony against members of the Aryan Brotherhood and alleged that he was having problems with both another prison gang and with a cellmate who plaintiff claimed was "using [him] for [his] tv and canteen." (Def. Motion App., Exh. D(1).) He requested a transfer to Cell House 5. Defendant Cory Burket reviewed video footage but could not confirm that Sounders and Davis had entered plaintiff's cell on the day of alleged assault.[4] Nor could Burket verify plaintiff's other allegations. Nevertheless, plaintiff was moved to a different cell as a precaution. (Def. Motion App., Exh. D ¶¶ 10-15 at 3.)

On September 10, 2007, Burket interviewed plaintiff about his allegations that he was not safe in CDOC due to his past testimony against the Aryan Brotherhood. At that time, plaintiff indicated that another inmate, Goodloe, "was the one instigating his problems," and because Goodloe had since left FLCF, "everything was good." He assured Burket "there [were] no issues to be concerned with and the letter sent can be considered voided." (*Id.*, Exh. D ¶¶ 17-18 at 3-4 & Exh. D(2).) However, on November 12, plaintiff filed a Step 1 grievance claiming that in separate incidents on August 11 and October 23, 2007, two others inmates, James Moulton and Charles Workman, respectively, had threatened to kill him. Although the incidents could not be verified, plaintiff was relocated to another cell. His request for a transfer to Ohio or another facility where he could be housed in protective custody, however, was denied. (*See* Plf. Resp. App., Exh. G.)[5]

---

[4] The security cameras do not point in to the cells themselves, but do show the hallways outside the cells. Burket maintains that the video footage did not show Sounders or Davis in the hallway outside plaintiff's cell on the date of the alleged assault.

[5] The shift commander, who responded to the initial complaint and the Step 1 grievance, stated

> The issue you presented to me on 10/23/07 could not be validated. It

On March 21, 2008, plaintiff reported that Sounders had come into his room the previous night and threatened him with a razor blade. Sounders denied the incident, and Burket, unable to verify that the altercation had occurred, concluded that "[n]o further action is needed at this time but the situation will be monitored." (Def. Motion App., Exh. D(4).)

Less than a week later, on March 27, inmate David Jennings assaulted plaintiff in a hallway. Video footage confirmed that Jennings, unprovoked, knocked plaintiff down and punched him in the head repeatedly. Although plaintiff claims that Jennings was a "known associate" of Sounders, Burket could not link Jennings to Sounders or any other known Aryan groups, nor could he confirm that the incident was related to "security threat group" ("STG") activity. (*Id.*, Exh. D ¶¶ 23-24 at 5 & Exh. D(6).) Nevertheless, Jennings was convicted of Class 1 Assault and received 30 days punitive segregation. On his release, Jennings remained separated from plaintiff, and plaintiff reportedly had no further incidents with Jennings. (*Id.*, Exh. D ¶¶ 25-28 at 5.)

---

was your word against the word of another offender. I also questioned the wisdom of pursuing an issue of this sort. You clearly agreed at the time we spoke, that an in-cell house move would rectify this situation. What I was not aware of, was that you had been moved to two other locations two weeks prior to our conversation. It was agreed that you were not in danger and that you would be able to suffice until the next appropriate bed space became available. You were moved on 11/07/07 and have made no other complaints that I am aware of. Your philosophy of "doing the right thing" is clearly causing difficulties with you adjustments here at FLCF. The issue we specifically dealt with was the fact that you informed staff of an issue with an offender in front of that offender. It was explained to you that you may believe it is the right thing to do: however, the majority of the offenders in this facility take a harsh view and may be compelled to act on this view. Lastly, no remedy is offered at this time as the Colorado Department of Corrections does not have a protective custody policy and the current issue at FLCF you presented could not be verified.

(See Plf. Resp. App., Exh. G.)

On April 2, 2008, plaintiff filled out a Step 1 grievance form regarding the March 27 attack, alleging deliberate indifference on the part of Maestas, Burket, and defendant A.J. Trujillo, the FLCF Housing Captain. (Plf. Motion App., Exh. I at 1.) Plaintiff maintains that he slid both this form and a Step 2 grievance under Maestas's door. (*Id.*, Exh. A ¶ 28 at 8 & Exh. I at 2.) No responses were provided,[6] and plaintiff submitted a Step 3 grievance directly to the CDOC office in Colorado Springs. (*Id.*, Exh. A ¶ 29 at 8-9 & Exh. I at 3.)[7]

Plaintiff asserts an Eighth Amendment claim for deliberate indifference related to the March 27, 2008, assault by Jennings. He also alleges that defendants retaliated against him by denying his requests to be moved to Cell House 5 or transferred to protective custody, refusing to process his grievances, and failing to investigate fully his various complaints. He further maintains that Trujillo retaliated against him by convicting him of a disciplinary violation he did not commit.

Defendants maintain first that plaintiff has failed to exhaust his administrative remedies with respect to these claims, as required by the Prison Litigation Reform Act ("PLRA"). 42 U.S.C. § 1997(e)(a); *see also* **Porter v. Nussle**, 534 U.S. 516, 523-24, 122 S.Ct. 983, 987-88, 152 L.Ed.2d 12 (2002); **Little v. Jones**, 607 F.3d 1245, 1249 (10th Cir. 2010). "To properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules – rules that are defined not by the PLRA, but by the prison grievance process itself."

---

[6] Maestas asserts that he never received either of these grievances.

[7] Plaintiff further alleges that Maestas refused to provide him with grievance forms.

***Jones v. Bock***, 549 U.S. 199, 211, 218, 127 S.Ct. 910, 922, 166 L.Ed.2d 798 (2007) (internal quotation marks and citation omitted). Accordingly, "resort to a prison grievance process must precede resort to a court." ***Steele v. Federal Bureau of Prisons***, 355 F.3d 1204, 1207 (10th Cir. 2003), ***cert. denied***, 125 S.Ct. 344 (2004) (internal quotation marks omitted). In this case, that process is defined by the CDOC's Administrative Regulation ("AR") 850-04, which contemplates a three-step grievance procedure. (***See*** Def. Motion App., Exh. A(1).) ***See also Jernigan v. Stuchell***, 304 F.3d 1030, 1032 (10th Cir. 2002) (exhaustion requirement satisfied only when prisoner completes grievance process).

Plaintiff offers neither argument nor evidence to demonstrate that he has ever submitted a grievance regarding his claim of retaliation. AR 850-04 specifically prohibits retaliation for participation in the grievance procedure and provides that "[a]n offender shall be entitled to file a grievance alleging that such a reprisal occurred." (Def. Motion App., Exh. A(1) ¶ IV.B.4 at 3.) Plaintiff, therefore, was required to exhaust this claim. ***See Carr v. Brill***, 187 Fed. Appx. 902, 905 (10th Cir. July 10, 2006). Because he did not, Claim Three must be dismissed without prejudice.

Plaintiff did attempt to file a grievance with respect to his Eight Amendment claim, however, and I agree with plaintiff that there are genuine issues of material fact regarding whether this claim has been exhausted.[8] Nevertheless, because summary

---

[8] Defendants maintain that this claim was not properly exhausted because plaintiff merely slid the Step 1 and Step 2 grievances under Maestas's door and submitted the Step 3 grievance directly to CDOC headquarters. (***See*** Def. Motion App., Exh. A(1) ¶ IV.B.8 at 3.) . "[P]roper exhaustion of administrative remedies . . . means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." ***Woodford v. Ngo***, 548 U.S. 81, 90, 126 S.Ct. 2378, 2385, 165 L.Ed.2d 368 (2006) (emphasis in original; citation and internal quotation marks omitted). Good faith but incomplete efforts to comply with the grievance procedures will not excuse the failure to exhaust.

7

judgment is proper on substantive grounds, I proceed to consider the merits.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." **U.S. CONST**. amend. VIII. As applied to prisoners, the Eighth Amendment, thus, guarantees "humane conditions of confinement guided by 'contemporary standards of decency.'" ***Penrod v. Zavaras***, 94 F .3d 1399, 1405 (10th Cir. 1996) (quoting ***Estelle v. Gamble***, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)). Prison officials must "ensur[e] inmates receive the basic necessities of adequate food, clothing, shelter, and medical care[.]" ***Barney v. Pulsipher***, 143 F.3d 1299, 1310 (10th Cir. 1998). Concomitantly, prison officials must "take reasonable measures to guarantee the safety of the inmates," including protecting them from

---

***Bridgeforth v. Workman***, 410 Fed. Appx. 99, 100-01 (10th Cir. Dec. 9, 2010); ***see also Little***, 607 F.3d at 1249 ("Because the prison's procedural requirements define the steps necessary for exhaustion, an inmate may only exhaust by properly following all of the steps laid out in the prison system's grievance procedure.") (internal citation omitted).

AR 850-04 requires that "[o]ffenders shall file Step 1, Step 2, and Step 3 grievances . . . with their case manager, or other DOC employees designated by the administrative head, who shall forward the grievance to the facility grievance coordinator for processing." (Def. Motion App., Exh. A(1) ¶ G.2 at 5.) What constitutes proper "filing" for these purposes is not further defined, and plaintiff insists that he had submitted other grievances to Maestas by sliding them under his door. Maestas himself confirms that although he discourages this practice, he does process grievances so submitted just as he would had they been delivered to him personally. (Plf. Resp. App., Exh. F at 64.) Moreover, although the regulation contemplates that at each step, a response shall be provided in writing and, with respect to Step 1 and Step 2 grievances, served on the inmate within 25 days of receipt, (***see id.***., Exh. A(1) ¶¶ IV.H.2 & IV.H. 6 at 6 & ¶ IV.I.1.b. at 7), it further provides that an inmate who fails to receive a response within this time limit "may proceed to the next step within five calendar days of the date the response was due" (***id.***, Exh. A(1) ¶ IV.I.1.d. at 7). It appears that this is what plaintiff did in this instance.

Moreover, although AR 850-04 requires that grievances be coordinated through the inmate's case manager (Def. Motion App., Exh. A(1) ¶ IV.G.2 at 5) and specifically states that "[g]rievances mailed by offenders directly to the Step 3 grievance officer . . . will not be processed" (***id.***, Exh. A(1) ¶ IV.B.8 at 3), it also provides that improperly submitted grievances will be returned to the inmate for proper submission (***id.***, Exh. A(1) ¶ IV.B.8 at 3; ***see also id.***, Exh. A(1) ¶ IV.B.1 at 2 (noting the "intention of this grievance process [is] to ensure that all grievances submitted by offenders are received, tracked, and responded to" and thus that procedurally deficient grievances will be returned to be cured and resubmitted). Accordingly, the fact that plaintiff mailed his Step 3 grievance directly to CDOC headquarters is not necessarily fatal in the absence of evidence that it was returned to him for proper submission.

violence at the hands of other prisoners. ***Farmer v. Brennan***, 511 U.S. 825, 832-33, 114 S.Ct. 1970, 1976-77, 128 L.Ed.2d 811 (1994) (citation and internal quotation marks omitted).

"It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." ***Id.***, 114 S.Ct. at 1977. To recover, plaintiff must make two showings. First, he must prove that the conditions of his confinement objectively posed a "substantial risk of serious harm." ***Id.***; ***see also Riddle v. Mondragon***, 83 F.3d 1197, 1204 (10th Cir. 1996). Although a plaintiff need not await a physical attack in order to obtain relief, he must demonstrate more than a vague, conclusory fear of violence. ***Riddle***, 83 F.3d at 1205. Sufficiently serious conditions "have been found to exist where prison officials disregard repeated warnings of danger to a particular prisoner and continually refuse to make the situation safer, for example either separating the prisoner from other inmates who previously have attacked him on multiple occasions[.]" ***Grimsley v. MacKay***, 93 F.3d 676, 681 (10th Cir. 1996).

The second component of an Eighth Amendment claim requires proof that prison officials were deliberately indifferent to the inmate's safety. This subjective inquiry implicates the officials' state of mind and is equivalent to "criminal recklessness, which makes a person liable when she consciously disregards a substantial risk of harm." ***Beauclair v. Graves***, 227 Fed. Appx. 773, 776 (10th Cir. 2007) (quoting ***Mata v. Saiz***, 427 F.3d 745, 752 (10th Cir. 2005)). Mere negligence, even gross negligence, or recklessness is insufficient to make out a claim under this standard. ***See Estelle***, 97

S.Ct. at 292; **see also Duffield v. Jackson**, 545 F.3d 1234, 1238 (10th Cir. 2008); **Perkins v. Kansas Department of Corrections**, 165 F.3d 803, 811 (10th Cir. 1999). Instead "the official must 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" **Riddle**, 83 F.3d at 1204 (quoting **Farmer**, 114 S.Ct. at 1977.) Thus, "it is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." **Whitley v. Albers**, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). Moreover, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." **Farmer**, 114 S.Ct. at 1982-83.

Given these standards, I conclude that no reasonable jury could find that these defendants were deliberately indifferent to plaintiff's safety while incarcerated at FLCF. Undoubtedly, as plaintiff argues, being labeled a snitch creates a risk within the prison system. **See Benefield v. McDowell**, 241 F.3d 1267, 1271 (10th Cir. 2001).[9] Nevertheless, and although plaintiff's "blue card" identified particular inmates at other facilities who had so labeled him, it was not unreasonable to conclude, as Trujillo asserts he did (**see** Plf. Resp. App., Exh. D at 91), that because none of those inmates was incarcerated at FLCF, plaintiff could be housed with the general prison population. Moreover, the facts seem to bear out that plaintiff was not in obvious danger in Cell

---

[9] The facts in **Benefield**, and the authority cited in support therein, however, involved prison officials themselves affixing the "snitch" label to the plaintiff, thus, satisfying both the objective and subjective prongs of the deliberate indifference test.

House 4. In the approximately 15 months between plaintiff's admission to FLCF and the attack by Jennings, plaintiff alleged just three prior instances of having been attacked or threatened – none of which could be corroborated. This evidence does not demonstrate the type of campaign of harassment that implicates the Eighth Amendment. *See Riddle*, 83 F.3d at 1205 ("constant threats" of violence or a "campaign of violent intimidation" required).

Clearly, plaintiff believes that relocation to Cell House 5 or transfer to a facility that offered protective custody would have been more effective in preventing the March 27, 2008, attack, but clairvoyance is not the standard by which defendants' actions are judged.[10] "[I]t is immaterial whether the Officers pursued what in retrospect appears to be the most effective response . . . the issue is not whether Defendant Officers would have prevented Plaintiff's injury had they pursued an alternative course of action." *Grimsley*, 93 F.3d at 682. Instead, defendants' responses to the alleged threats to plaintiff's safety all were reasonable and, according to contemporaneous reports, effective. Each time plaintiff identified a particular inmate and/or a particular threat, defendants investigated and responded to his concerns, either by relocating him or separating the other inmate from him, or simply by monitoring his interactions with those particular inmates. Plaintiff's more global, nonspecific fears of the Aryan Brotherhood and other white supremacist STGs within the prison system did not necessarily impose on defendants a constitutional obligation to do more to alleviate his understandable but

---

[10] Moreover, plaintiff's supposition that Cell House 5 posed less risk to him is plainly speculative. At best, he can claim only that Cell House 5 houses fewer violent inmates than Cell House 4.

unverified fears.[11]

Even if they had, the fact remains that, prior to his attacking plaintiff, Jennings was not known to be associated with any white supremacist STG, and, indeed, it is still not clear that he is so associated, plaintiff's own subjective conviction to the contrary notwithstanding. ***Ware v. Denver Health***, 2010 WL 2740078 at *4 (D. Colo. July 12, 2010) ("Untethered from any concrete facts, plaintiff's subjective beliefs are not competent summary judgment evidence."). The entirety of plaintiff's evidence of his assertion that Jennings was a "known associate" of Sounders consists of Burket's testimony that Jennings and Sounders ate meals together "at times." (Plf. Resp. App., Exh. B at 164-165.) In the absence of any indication either that any of these interactions occurred at or near the time of the March 27, 2008, attack, or that Sounders only ate with other STG members, this evidence is insufficient to create a genuine issue of material fact regarding whether defendants subjectively were aware that Jennings posed a substantial or obvious risk of harm to plaintiff prior to the attack.

Accordingly, I find and conclude that there is no genuine issue of material fact regarding plaintiff's Eighth Amendment claim, and defendants are entitled to summary judgment on that claim as well.

## IV. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1. That the **Order of Reference** to the magistrate judge [#138] filed June 27,

---

[11] Indeed, when Burket questioned plaintiff about these larger concerns in September, 2007, plaintiff claimed that the departure of a particular inmate who had been "instigating his problems" had rectified the situation. (Def. Motion App., Exh. D(2).)

2011, is **WITHDRAWN**;

    2. That defendants' **Motion for Summary Judgment** [#137] filed June 24, 2011, is **GRANTED**;

    3. That plaintiff's Second Claim for Relief (42 U.S.C. § 1983 – Violation of Eighth Amendment for Failure To Protect), is **DISMISSED WITH PREJUDICE**;

    4. That plaintiff's Third Claim for Relief (42 U.S.C. § 1983 – Retaliation), is **DISMISSED WITHOUT PREJUDICE** for failure to exhaust administrative remedies;

    5. That judgment **SHALL ENTER** on behalf of defendants, Captain A.J. Trujillo, Lieutenant Cory Burket, and Lieutenant James Maestas, against plaintiff, Troy A. Short, as follows:

        a. With respect to plaintiff's Second Claim for Relief, alleging violation of the Eighth Amendment as provided in this Order; provided, that the judgment as to this claim **SHALL BE** with prejudice;

        b. With respect to plaintiff's Third Claim for Relief, alleging retaliation for exercise of constitutional rights; provided, that the judgment as to this claim **SHALL BE** without prejudice;

    6. That judgment also **SHALL ENTER** on behalf of former defendant, Aristedes W. Zavaras, against plaintiff, Troy A. Short, as to plaintiff's Claim One, as provided in my **Order Adopting Recommendations of the United States Magistrate Judge** [#70] filed August 10, 2009; provided, that the judgment as to this claim **SHALL BE** with prejudice;

    7. That the Trial Preparation Conference, currently scheduled for Friday,

September 16, 2011, at 2:30 p.m., as well as the trial, currently scheduled to commence on Monday, October 3, 2011, are **VACATED**; and

    8. That defendants are **AWARDED** their costs, to be taxed by the Clerk of the Court pursuant to Fed.R.Civ.P. 54(d)(1) and D.C.COLO.LCivR 54.1.

Dated September 12, 2011, at Denver, Colorado.

                                                **BY THE COURT:**

                                                */s/ Robert E. Blackburn*
Robert E. Blackburn
United States District Judge